# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### February 13, 2001 Session

## STATE OF TENNESSEE v. MARCUS W. KEENER

**Appeal from the Circuit Court for Lawrence County**
**No. 20403     Robert L. Jones, Judge**

---

### No. M2000-00177-CCA-R3-CD - Filed April 26, 2001

---

The defendant was indicted for first degree murder and convicted by a Lawrence County jury of second degree murder. In this appeal as of right, the defendant presents two issues for our review: (1) whether the evidence was sufficient to support his conviction; and (2) whether the trial court erred in failing to charge the jury on the lesser-included offenses of criminally negligent homicide and reckless homicide. The trial court charged the jury as to first degree murder, second degree murder, and voluntary manslaughter. The defendant received a sentence of twenty years to be served at 100% in the Tennessee Department of Correction. Having reviewed the entire record, we conclude that the evidence was sufficient to convict the defendant of second degree murder. We further conclude that the trial court did not err in failing to instruct on two additional lesser-included offenses. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., joined. GARY R. WADE, P.J., filed a concurring opinion.

Robert D. Massey, Pulaski, Tennessee, for the appellant, Marcus W. Keener.

Paul G. Summers, Attorney General and Reporter; Marvin E. Clements, Jr., Assistant Attorney General; T. Michael Bottoms, District Attorney General; Robert C. Sanders, Assistant District Attorney General; and James G. White, II, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Marcus W. Keener, was indicted by a Lawrence County Grand Jury for first degree murder for the shooting death of Steven Bates on April 3, 1998. Following a four-day trial, the defendant was convicted of second degree murder, a Class A felony, and sentenced to twenty years incarceration as a violent offender plus a $50,000 fine. In this appeal as of right, the defendant presents two issues for our review:

I.  Whether the evidence is sufficient to convict the defendant of second degree murder; and

II. Whether the trial court erred by failing to instruct the jury on the lesser-included offenses of criminally negligent homicide and reckless homicide.

Having reviewed the entire record and applicable law, we affirm the judgment of the trial court.

## FACTS

The events in this case occurred in a rural area of the southernmost part of Lawrence County, near Iron City, Tennessee, not far from the Alabama state line. The victim, Steven Bates, age thirty-four, lived with his girlfriend, Jennifer Parker, and her children. The victim's mobile home was located on Iron City Road, a road that runs east and west between Iron City and St. Joseph. Some three and one-half football field lengths to the east was the mobile home of the defendant, located on the same side of the road as the victim's home. The defendant, a young, single male within days of turning twenty-three at the time of the offense, worked as a chainsaw operator and skidder[1] for Florence Logging, an Alabama wood pulp company. At the time of the murder, the defendant testified that he was living with his mother in Olive Hill, in Hardin County.

On April 3, 1998, the defendant drove his orange Camaro to the home of Sammy Moore, a friend and coworker, in Iron City. The defendant was in the habit of leaving his car at Moore's house and riding to work with Moore in the company truck. Another coworker, Rodney Heatherly, as a rule also met at Moore's house to get a ride to work. On this day, it had been raining during the night and so the woods were wet. When the defendant arrived at Moore's house, they decided that Moore should call the company office to see if they needed to report to work. Moore was told that the men should not report for work on that day because of the wet conditions. When Heatherly arrived at Moore's house in the defendant's truck, a four-wheel drive vehicle that the defendant had lent to Heatherly, the three men decided to drive in the defendant's truck to company headquarters in Florence, Alabama, to pick up their paychecks since it was payday. After picking up and cashing their checks, the defendant purchased four new tires for his truck. With new tires and a supply of beer, the men headed back to Iron City. Once back in Tennessee, they decided to "try out" the new tires by running the truck over hills and through mud in the cleared-out area under the Tennessee Valley Authority power lines near Iron City. The truck apparently overheated, and when the defendant tried to restart it after a cooling-down period, the truck would not start. The men left the truck where it was and walked back to Moore's house where the defendant had left his Camaro. The defendant and Heatherly left together in the Camaro, and Moore stayed at home.

The defendant and Heatherly headed east out of Iron City toward the defendant's home. On the way, they passed the home of the victim, Steven Bates, who was related to the defendant, and

---

[1]A "skidder" is a worker who operates equipment that drags logs from the stump to a landing or mill.

decided to ask the victim to help start the defendant's truck. The victim agreed to help, and the three men then got into the victim's truck and headed out to the power lines. They were able to get the truck started, and Heatherly drove it to the defendant's home while the defendant and the victim followed in the victim's truck. The victim drove first to his home where he and the defendant then got into the Camaro and drove on to the defendant's house to pick up Heatherly. They planned to go out and get more beer. Heatherly's wife was at the defendant's home, and Heatherly went home with her. The defendant's girlfriend was also at the defendant's home, but she left because she did not like the defendant's drinking. That left the defendant and the victim to drive to get beer. They bought half a case and headed back to the victim's home. It was still light when they parked the Camaro in the driveway on the west side of the mobile home.

The victim and the defendant sat in the Camaro, listening to the radio and drinking beer. At one point, the defendant revved up the engine to show the victim how smoothly it ran. Somehow the transmission got stuck in third gear. The defendant stopped the engine, and the men drank a few more beers while the engine cooled down. They jacked the car up to see if they could locate the problem but were unable to do so. Frustrated and angry, the defendant reached into the car, took his pistol out of its holster, and shot the transmission. By this time, it was dark, and the victim, laughing at the situation, told the defendant to come inside and just forget about the car. The two went inside where the victim's girlfriend, Jennifer Parker, had prepared some food for them. The men continued to drink beer and added shots of whiskey. The three sat at the kitchen table, drinking, talking, and listening to music until late in the evening.

Jennifer Parker, who had lived with the victim for about six months, continued what had apparently been an ongoing conversation between her and the defendant. She asked the defendant why he did not like her. Parker and the defendant had had a "one night thing," according to Parker. While the victim was outside on the front porch of the home, "using the bathroom," the defendant told Parker that she had given him "crabs." The victim apparently heard enough of their conversation to become angry, and a fight between the two men erupted with the victim wrestling the defendant to the floor. Parker tried to stop the fight, and the victim turned on her, shoving her against the kitchen table. Furniture was broken and overturned during the melee.

Once he was free, the defendant fled the victim's home and headed east toward his own home. Substantially uncontroverted are the following events. The defendant decided to return to the victim's home. As he approached, he heard noises around the west end of the home where his Camaro was parked and saw the victim smashing the windows of his car. The defendant testified that it was too dark for him to tell what the victim was using to smash the windows, but he thought it might have been a gun. Police later identified the object as one of the legs from the broken furniture. The defendant turned on the victim and fired his seven-millimeter magnum deer rifle into the victim's abdomen at a distance greater than two feet.[2] Where the rifle came from was a

---

[2]Dr. Charles Harlan, Lawrence County Medical Examiner, testified that the wound was a "distant wound," that is, "a gunshot wound in which the muzzle to skin distance is greater than 24 inches out to the maximum effective range

(continued...)

controverted fact. The defendant testified at trial that the rifle was inside his Camaro where he always kept it. Other witnesses testified that the defendant had told them that he went home to get the rifle. Regardless of where he got the rifle, the defendant admitted that, after firing the weapon, he drove away, heading west toward Iron City. When he got to Shoal Creek, he threw the rifle into the creek. The rifle was never found.

The defendant spent the night at the home of his friend, Sammy Moore. Moore's girlfriend, Alice Sherrill, testified that the defendant came to their back door sometime around midnight. He was cold, wet, and smelled of alcohol. Later the next day, April 4, the defendant's two uncles drove in a truck to Moore's house. One uncle got out of the truck and called to the defendant, who was in the woods near Moore's house. When the defendant emerged, his uncles took him to the county jail to turn himself in. Moore disappeared some months prior to trial and did not testify.

## ANALYSIS

### Issue I. Sufficiency of the Evidence

The defendant contends that the evidence was insufficient to convict him of second degree murder. The defendant asserts that he acted in self-defense when he fired on the victim, or that the evidence, at most, proved only that he acted in a state of passion produced by adequate provocation, facts supporting a conviction for voluntary manslaughter. The State contends that the evidence in the record supports the conviction for second degree murder.

When a defendant challenges the convicting evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that might be drawn from the evidence. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as the trier of fact. See Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978) (citing Withers v. State, 523 S.W.2d 364 (Tenn. Crim. App. 1975)). In a criminal action, a conviction may be set aside only when the reviewing court finds that the "evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e); see also Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979) (concluding that courts reviewing sufficiency of evidence must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). A jury verdict, approved by the trial judge, accredits the witnesses for the State and resolves any conflicts in the testimony in favor of the State. See State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978).

---

[2](...continued)
of the weapon and the cartridge." The defendant testified that the rifle he used to shoot the victim had a range of two hundred yards.

Tennessee Code Annotated Section 39-13-210 provides, in pertinent part, that second degree murder is "[a] knowing killing of another." Id. 39-13-210(a) (1997). "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-106(a)(20).

The evidence at trial showed that Jennifer Parker placed a 911 call at 11:42 p.m. on April 3, 1998, to report a domestic fight at 351 Iron City Road. Officer Jason Ellis with the Lawrence County Sheriff's Department was dispatched to the home of the victim, arriving within approximately six minutes. Ellis knew the address and the parties living there. Ellis testified that Parker was coming out of the home with clothes in a basket and that two children were in a car parked in front of the home. Parker testified that she was collecting her clothes and those of her children and had put her children in her car so that she could leave. Ellis testified that Parker did not tell him that anyone had been shot but rather grabbed him by the arm and led him inside the home to show him the damage that had occurred during the fight. She told Ellis that the victim was probably outside somewhere with a gun. While Ellis was contacting his sergeant on the car radio, he saw Parker run around the northwest corner of the home. She came back screaming, "Oh my God, he shot himself." Ellis approached the victim, asking, "Where's the gun at Stevie, where's the gun?" Ellis testified further that the victim stated, "I don't have the gun. Ask her. She's the one that shot me," and Parker replied, "Stevie, I didn't shoot you. You shot yourself." According to Officer Ellis, it was at this point that Chief of Police Dennis Daniels and Officer Chuck Neese from the St. Joseph Police Department arrived.

Chief Daniels, a twenty-five-year veteran police officer, testified that he was dispatched to the victim's home at 11:52 p.m. He testified to the following:

> A. On our arrival when we turned off of 227 into the driveway the headlights were shining right behind - - back behind the trailer. At that time I could see a white male that I recognized as Steve Bates lying on the ground. Officer Jason Ellis was standing kindly over the person. There was also a white female standing behind Officer Ellis. I noticed that Mr. Bates' shirt was completely drenched in blood. I went to where Mr. Bates - - he was trying to get up off the ground. I went and knelt down beside of him and was trying to keep him still until the ambulance personnel arrived.
>
> Q. All right, and did Mr. Bates make any statements to you?
>
> A. Yeah, sir, he did.
>
> Q. What were those statements?

A. Mr. Bates told me that he was dying and that Mark Keener had shot him.

Q. How many times did he tell you that?

A. Approximately three to four times before he couldn't talk anymore.

. . . .

Q. When the ambulance arrived, what happened then?

A. The paramedics checked Mr. Bates for vital signs and stuff like that and then they went back to get the cot to put Mr. Bates on. At this time Mr. Bates made one other statement. He caught a hold of my arm and made one other statement and then he kind of laid his head over to one side and he didn't speak or move anymore after that.

Q. Was that statement something personal to you?

A. Yes, sir.

Q. You and Mr. Bates had known each other for some time?

A. Yes, sir.

Michael Bromley testified that he was married to Sheleigh Bromley whose grandmother, Winnie Mae Phillips, was also the defendant's grandmother. Bromley had a trailer in Hardin County, apparently not far from the home of the defendant's mother and her husband, Charlotte and Elva Malone. Bromley and the defendant had been friends since childhood. Bromley testified that the defendant, after the shooting and while out on bond, recounted the events of April 3, 1998, to him. Bromley testified to the following:

Q. What did he tell you?

A. Said Jenny offered him some sex and he said he didn't want none because last time he had some she gave him the crabs, and Stevie heard that. So he got mad and they went to fighting in the house. I guess Mark managed to get out of the house and Stevie had a table leg and I guess was chasing him around the car and around the trailer and beat the windows out of his car. I guess Mark ran off and came back. I don't know if he went home. He had a gun in his car and that's when he shot him.

-6-

Although in his written statement dated January 13, 1999, Bromley noted that the defendant told him that he "ran home to get another gun," Bromley testified that the defendant said that "he got a gun and shot him," without explaining from where the defendant claimed to have retrieved the gun.[3]

The defendant's uncle, Douglas Phillips, testified that he and his brother, Michael Phillips, decided early on the morning after the shooting that they would try to find the defendant and get him to turn himself in to law enforcement. Douglas Phillips testified that he got involved because he wanted to prevent any more trouble. Once the defendant was found and agreed to come with his uncles, Douglas Phillips drove the truck while Michael Phillips rode in the passenger seat and the defendant hid in the floor between his uncles until they were well on their way to Lawrenceburg. Douglas Phillips testified to the following:

> As we was going up the road there he said that Stevie got mad about something, but he never did detail that I can remember what he got mad about or nothing like that. He said Stevie had him down, had him under the throat. He kindly showed us how he had - - and he said, "I'm going to rip your head off." Had him like that and was going to "rip your head off". I remember that. Then the next thing that I remember, they was outside and he got the - - I thought he told me he went home. Now that's what I thought he told me, he went home. But I'm not real sure on that but I think that's what he said, he went home.

The defendant testified that he left the victim's home and walked about the length of a football field toward his house. He then turned around and walked back to the victim's house and peeked in the window but did not see the victim. He then walked to his car where he saw the victim breaking the windows out of it. Seeing the defendant, the victim said, "Come here you little son of a bitch," causing the defendant to run, as the victim jumped at him. The defendant said the victim

---

[3]The defendant's bond was revoked because of an incident on February 3, 1999. According to testimony at the bond revocation hearing, a copy of Bromley's statement to a Tennessee Bureau of Investigation ("TBI") agent had been mailed by the defendant's lawyer to the defendant's mother, Charlotte Malone. Enraged by the statement, Ms. Malone drove to her mother's house in Lawrence County, outside Iron City, where Bromley and her niece had been living temporarily. Ms. Malone threw Bromley's belongings out in the yard. She also called her son, the defendant, apparently leaving a message to tell him where she was. She and her son had already spoken about Bromley's statement. When Bromley and his wife and their infant daughter arrived home, the defendant pulled up and parked near Bromley. Bromley was unaware that anyone knew of the contents of his statement. The defendant was driving his truck and was accompanied by his stepfather, Elva Malone, and Mr. Malone's son, Pete. Mr. Malone had a pistol. A fight ensued between Pete Malone and Bromley. During the fight, Elva Malone held a metal pipe and threatened to "bust [Bromley's] . . . brains out." When Bromley got up, the defendant hit him in the back of the leg with a pipe. Elva Malone fired his pistol repeatedly, hitting Bromley in the leg before Bromley was able to get his wife and baby into their car and drive off. Bromley described this incident during his trial testimony.

had something in his hand that was black and "looked just like a gun." The defendant then ran up to his car, pulled out his rifle, and shot the victim.

On cross-examination, the defendant stated that he kept his seven-millimeter magnum rifle in his car and always took it and his pistol into the woods when he was working to shoot any snakes or crows. The following exchange concerning the murder weapon took place on cross-examination:

> Q. You've killed twenty or thirty deer with this very rifle, have you not?
>
> A. Yes, sir.
>
> Q. And you would know that if someone [was] shot at that range with that high powered rifle, he wouldn't be going far, would he?
>
> A. I wouldn't think so.

As to the defendant's self-defense argument, the jury received proper instruction on self-defense and acted within its prerogative as the trier of fact when it rejected the defense. Our supreme court has explained:

> The jury determines not only whether a confrontation has occurred, but also which person was the aggressor. It also decides whether the defendant's belief in imminent danger was reasonable, whether the force used was reasonable, and whether the defendant was without fault. Thus, a defendant may expect only that the jury be properly instructed regarding the law of self-defense . . . thereby enabling the jury to correctly apply the law to the facts as it finds them.

State v. Renner, 912 S.W.2d 701, 704 (Tenn. 1995). Here, the defendant admitted that he was out of all danger when he left the victim's home; it was his decision to return. Evidence showed that the defendant's pistol, used to shoot the transmission of his Camaro and later found in its holster in the victim's yard, was empty. There was also testimony to the fact that the defendant knew this. There was no evidence that the victim had a deadly weapon of any kind. Although there was conflicting testimony as to the location of the seven-millimeter magnum rifle when the defendant retrieved it, there was clear evidence that the defendant knew that he was using a powerful weapon capable of killing large game animals at significant distances.

In reaching its verdict, the jury also rejected the lesser offense of voluntary manslaughter. The defendant argues that this offense is the most the evidence could support beyond a reasonable doubt. Voluntary manslaughter is the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). The evidence showed that both the defendant and the

victim had been drinking heavily.[4]  The jury was properly instructed as to the legal implications of voluntary intoxication and obviously did not believe that the defendant was in some additional "state of passion" or that he had been "adequately provoked."

We conclude that the evidence was sufficient to support the conviction for second degree murder.  This issue is without merit.

### Issue II.  Instruction on Lesser-Included Offenses

Finally, the defendant contends that the trial court erred in failing to instruct the jury on the lesser-included offenses of criminally negligent homicide and reckless homicide.  The defendant requested instruction on both offenses, as well as second degree murder and voluntary manslaughter, prior to trial.  The trial court planned to and did instruct the jury as to first degree murder, second degree murder, and voluntary manslaughter.  The trial court asked the following: "First of all, are there any objections or additions from the State or the defendant outside the presence of the jury about the instructions?"  Both the State and the defendant stated to the trial court that they had no objections or additions.

According to statutory law, the trial court must charge the jury as to all lesser-included offenses included in the indictment whether or not the defendant requests that it do so.  See Tenn. Code Ann. § 40-18-110(a).  The following test for determining whether an offense is a lesser-included offense of another has been established by our supreme court:

> An offense is a lesser-included offense if:
>
> (a)  all of its statutory elements are included within the statutory elements of the offense charged; or
>
> (b)  it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
>
> > (1)  a different mental state indicating a lesser kind of culpability; and/or
> >
> > (2)  a less serious harm or risk of harm to the same person, property or public interest; or
>
> (c)  it consists of

---

[4]The victim's autopsy showed a blood alcohol level of .16%.  The defendant testified that he had drunk twelve or more beers during the day, and that was before he went into the victim's home where he drank more beer and whiskey.

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999).[5] The State acknowledges that, according to the Burns test, both criminally negligent homicide and reckless homicide are lesser-included offenses of first degree murder and second degree murder. A person is guilty of the offense of criminally negligent homicide where criminally negligent conduct results in death. See Tenn. Code Ann. § 39-13-212; see also State v. Lynn, 924 S.W.2d 892, 899 (Tenn. 1996) (holding that criminally negligent homicide is a lesser-included offense of second degree murder). A person is guilty of the offense of reckless homicide where reckless conduct results in death. See Tenn. Code Ann. § 39-13-215. All the statutory elements for both offenses are included within the statutory elements of first degree murder.

Having determined that both criminally negligent homicide and reckless homicide are lesser-included offenses of first and second degree murder according to the Burns test, we next determine whether the evidence adduced at trial justified a jury instruction on either of these lesser offenses. Our supreme court has interpreted the statute mandating instruction on lesser-included offenses to mean "that a trial court must instruct the jury on all lesser offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense." State v. Bolden, 979 S.W.2d 587, 593 (Tenn. 1998) (citing State v. Cleveland, 959 S.W.2d 548, 553 (Tenn. 1997)). Therefore, while the obligation of the trial court to instruct on lesser offenses is mandatory, compliance is not inevitable since the obligation is conditioned on there being "sufficient evidence for a rational trier of fact to find a defendant guilty of a lesser offense." Id. (citing Strader v. State, 210 Tenn. 669, 362 S.W.2d 224, 228 (1962)); see also State v. Stephenson, 878 S.W.2d 530, 550 (Tenn. 1994) (concluding that failure of trial court to instruct jury on voluntary manslaughter or criminally negligent homicide was not error where the record was devoid of any evidence to support an inference of either lesser offense). A year after Bolden, our supreme court explained this second level of inquiry as one having two parts: "First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense." Burns, 6 S.W.3d at 469.

---

[5]Although Burns was not decided until November 8, 1999, and the defendant's trial was held February 22-25, 1999, this court has applied the Burns test retroactively. See State v. Jumbo Kuri, No. M1999-00638-CCA-R3-CD, 2000 WL 680373, at *4 (Tenn. Crim. App. May 25, 2000).

Second, the trial court must determine if the evidence, viewed as favoring the existence of the lesser-included offense, is "legally sufficient to support a conviction for the lesser-included offense." Id.

A person acts with the requisite mens rea for criminal negligence "when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. §§ 39-11-106(a)(4) & 39-11-302(d). The level of gross negligence required to support a conviction for criminally negligent homicide necessitates a showing that the defendant failed to perceive that his or her conduct presented an unjustifiable risk to the victim. See, e.g., State v. Owens, 820 S.W.2d 757, 760-61 (Tenn. Crim. App. 1991) ("To affirm this conviction we must view the circumstances under which the appellant acted and find she failed to perceive that her conduct presented an unjustifiable risk to her child. The failure to perceive the risk must be a *gross* deviation from the standard of care that an *ordinary* person would exercise *under the circumstances*."). Here, no reasonable trier of fact could have found that the defendant, an experienced hunter, did not perceive that when he fired his seven-millimeter magnum rifle into the abdomen of a man standing only feet away, he was going to kill him.

As to the offense of reckless homicide, a person acts with the requisite mens rea of recklessness "when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." Tenn. Code Ann. §§ 39-11-106(a)(31) & 39-11-302(c). The Sentencing Commission Comments to Tennessee Code Annotated Section 39-11-302(c) note that this subsection "provides liability for conscious risk creation where there is no desire that the risk occur or no awareness that it is practically certain to occur." Here, no evidence was presented from which a rational trier of fact could conclude that the defendant had no desire that the risk occur or no awareness that it was practically certain to occur. On the contrary, the defendant, even though out of harm's reach, returned to the victim's home, retrieved a powerful and deadly weapon, either from his own nearby home or from his car, and fired point-blank at the victim.

We conclude there was no evidence that could lead a reasonable jury to conclude that the defendant acted with the mens rea required for either criminally negligent homicide or reckless homicide. Even if we were to conclude to the contrary, the failure of the trial court to instruct on these lesser offenses would be subject to a harmless error analysis. See State v. Williams, 977 S.W.2d 101, 104-05 (Tenn. 1998) (concluding that in modern jurisprudence, the presumption is that harmless error analysis should be applied to instruction on lesser offenses). We acknowledge the lack of agreement concerning the standard of harmless error to use where the issue is instruction on lesser-included offenses. On the one hand, our supreme court in Williams noted that the right to instructions on lesser offenses, although at times "described as a constitutional right," in Tennessee, "actually derives from a statute, Tenn. Code Ann. § 40-18-110(a) (1997 Repl.)." Id. at 105. Failure

of the trial court to accede to a statutory requirement would be subject, according to the Williams court, to the harmless error analysis set out in Tennessee Rule of Criminal Procedure 52(a). Id. Under that procedural rule, "No judgment of conviction shall be reversed on appeal except for errors which affirmatively appear to have affected the result of the trial on the merits." Tenn. R. Crim. P. 52(a).

On the other hand, if the foundation of the right to instruction on lesser-included offenses be constitutional, whether derived from the right to trial by jury or, as one panel of this court has suggested, the right to have the trial judge declare the law but never facts according to the provisions of Article VI, section 9 of the Tennessee Constitution, see State v. Jason Thomas Beeler, No. W1999-01417-CCA-R3-CD, 2000 WL 1670945, at *24-25 (Tenn. Crim. App. Nov. 2, 2000), the harmless error analysis then follows the more rigorous standard of Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed. 2d 705 (1967). According to the Chapman standard, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. Our supreme court in State v. Bolden, 979 S.W.2d 587, 593 (Tenn. 1998), arguably placed the mandate to instruct on a lesser-included offense, "provided there is sufficient evidence for a rational trier of fact to find a defendant guilty of a lesser offense," within a constitutional ambit by concluding the following: "One purpose of the statute is to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment." This court has stated, "If the failure to charge a lesser included offense is an error of constitutional dimension, as *Bolden* would imply, the proper question is whether the error is harmless beyond a reasonable doubt." State v. Michael G. Upshaw, No. W1999-00777-CCA-R3-CD, 2001 WL 29456, at *8 (Tenn. Crim. App. Jan. 11, 2001). Additionally, "[i]f the error is constitutional, the burden shifts to the state to prove harmlessness beyond a reasonable doubt." Beeler, 2000 WL 1670945, at *21.

By convicting the defendant of second degree murder, the jury determined that the evidence was sufficient to establish a knowing killing of another beyond a reasonable doubt. The jury rejected the immediately lesser crime of voluntary manslaughter. We conclude that the jury, even had it been instructed as to additional lesser offenses, would have also rejected these in favor of the convicted crime of second degree murder. This conclusion is consistent with case law not only in this state but in our sister states. See Williams, 977 S.W.2d at 106 (holding that trial court's failure to charge voluntary manslaughter was "harmless beyond a reasonable doubt" when the jury convicted defendant of first degree murder and rejected second degree murder); see also, e.g., State v. Gotschall, 782 P.2d 459, 464 (Utah 1989) ("We conclude that even if it was error for the trial court not to instruct the jury on negligent homicide . . . the error was harmless. The jury had the opportunity to find that [the defendant] acted with a lesser mental state than that required for second degree murder when it was given a manslaughter instruction, yet it convicted [the defendant] of second degree murder."); People v. Mullins, 532 P.2d 733, 735 (Colo. 1975) ("The jury rejected the less serious offense of two alternatives. If the jury had been given three alternatives, the resulting verdict would have undoubtedly been the same as here."). We conclude that, even if the trial court

committed error by failing to instruct on the lesser-included offenses of criminally negligent homicide and reckless homicide, any error is harmless beyond a reasonable doubt.[6]

## CONCLUSION

We conclude that the evidence was sufficient to convict the defendant of second degree murder. We also conclude that the trial court did not err in failing to instruct the jury as to two additional, lesser-included offenses, but that even if the trial court did err, such error was harmless beyond a reasonable doubt. The judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE

---

[6]The defendant cites supplemental authority according to Tennessee Rule of Appellate Procedure 27(d) for our consideration. The defendant suggests that the holding in State v. Bobby J. Hughes, No. W1999-00360-CCA-R3-CD, 2001 WL 91736, at *12-14 (Tenn. Crim. App. Jan. 26, 2001), is pertinent to his appeal. We disagree. In Hughes, the defendant was indicted for attempted second degree murder. He argued that the trial court erred by failing to instruct the jury on attempted voluntary manslaughter. The defendant testified that the victim, after losing a chess match to him, hurled profanities at him, challenged him to fight, and then hit another friend who was present in the head with a champagne bottle, knocking him unconscious. The victim then turned on the defendant, swinging the bottle. In the struggle that ensued, the defendant picked up a butcher knife and cut the victim's neck. The trial court instructed the jury on attempted second degree murder, aggravated assault, and assault, but not attempted voluntary manslaughter. A panel of this court concluded that there was evidence adduced at trial from which a reasonable jury could conclude that the victim provoked the defendant during their fight, causing the defendant to become enraged to such a degree that he was no longer capable of cool reflection. Id. (citations omitted). Accordingly, the panel concluded that the trial court erred by failing to instruct the jury on attempted voluntary manslaughter.

While the analytical process followed by the panel of this court in Hughes in considering the issue of instruction on lesser-included offenses is consistent with the analytical process followed here, we believe that the results are appropriately dissimilar. In Hughes, having determined that attempted voluntary manslaughter was a lesser-included offense of attempted second degree murder, pursuant to the Burns test, the panel next concluded that there was evidence legally sufficient to support a conviction of the lesser offense. Finally, the error of the trial court in failing to instruct on attempted voluntary manslaughter failed to meet the test in Chapman of "harmless beyond a reasonable doubt." Accordingly, the defendant's conviction in Hughes was reversed and the case remanded for a new trial.

In the instant case, while we determined that criminally negligent homicide and reckless homicide are lesser-included offenses under the Burns test, we also determined that there was no evidence presented at trial from which a reasonable jury could conclude that the defendant acted with the requisite mens rea for either lesser-included offense.